UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 08-10

HENRY LOUIS WALLACE,

                Petitioner - Appellant,

        v.

GERALD J. BRANKER, Warden, Central Prison, Raleigh, North
Carolina,

                Respondent - Appellee.

Appeal from the United States District Court for the Western
District of North Carolina, at Charlotte.    Robert  J.
Conrad, Jr., Chief District Judge.  (3:05-cv-00464-RJC)

Argued: October 29, 2009          Decided: December 2, 2009

Before WILKINSON, MICHAEL, and AGEE, Circuit Judges.

Affirmed by unpublished opinion.   Judge Michael wrote the
opinion, in which Judge Wilkinson and Judge Agee joined.

**ARGUED:** Ann Bach Petersen, GLOVER & PETERSEN, PA, Chapel Hill,
North Carolina, for Appellant.   Steven Mark Arbogast, NORTH
CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for
Appellee.   **ON BRIEF:** James R. Glover, GLOVER & PETERSEN, PA,
Chapel Hill, North Carolina, for Appellant.   Roy Cooper,
Attorney General, Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

MICHAEL, Circuit Judge:

In January 1997 Henry Louis Wallace was convicted in North Carolina of nine counts of first-degree murder, eight counts of first-degree rape, one count of second-degree rape, two counts of first-degree sexual offense, two counts of second-degree sexual offense, one count of assault on a child under the age of twelve, and five counts of robbery with a dangerous weapon. He was sentenced to death on each of the murder counts. After exhausting his state remedies, Wallace petitioned a federal district court in North Carolina for a writ of habeas corpus, which the court denied. We granted a certificate of appealability on two of Wallace's claims: (1) that pretrial publicity and the state court's denial of his motion for a change of venue deprived him of an impartial jury and (2) that delayed administration of Miranda warnings rendered his confessions involuntary and therefore inadmissible. After considering these claims, we affirm the district court's denial of the writ.

I.

A.

The North Carolina Supreme Court described the facts of the nine murders for which Wallace was convicted as follows:

> The State presented evidence tending to show that defendant [Henry Louis Wallace] murdered nine women in the Charlotte area over a two-year period. Defendant

2

was identified as a suspect in three of the later murders by a palmprint found on the car of one of the victims. As will be detailed below, defendant was arrested on an outstanding larceny charge and interrogated by police. He confessed to the murders of Shawna Hawk, Audrey Spain, Valencia Mack, Betty Baucom, Brandi Henderson, and Deborah Slaughter. The State presented the following evidence:

<u>Caroline Love Murder</u>

On 15 June 1992, Caroline Love was living in an apartment with Sadie McKnight, defendant's girlfriend. That night, after completing her shift at the Bojangles' restaurant on Central Avenue in Charlotte, Love asked the night manager if she could buy a roll of quarters to do her laundry. The night manager exchanged a roll of quarters for a ten-dollar bill, and Love left the premises. As Love walked toward her apartment, her cousin, Robert Ross, saw her walking, offered her a ride, and drove her home. Ross watched as Love entered her apartment.

A few days later, Love's employer contacted Love's sister, Kathy Love (Kathy), and informed her that Love had not come to work in two days. Kathy went to Love's apartment and left a note. However, the next day, Kathy was again informed Love had not come to work. Kathy then contacted defendant, whom she knew, to find Love's roommate, McKnight. Kathy, McKnight, and defendant went to the police station to file a missing person's report. Later, Kathy went into Love's apartment. She noticed that some of the furniture had been moved and that some of the sheets from Love's bed were missing, but there was no evidence of Love's whereabouts. During the investigation of the missing person's report, Investigator Tony Rice of the Charlotte-Mecklenburg Police Department determined that the roll of quarters Love bought prior to leaving work on 15 June 1992 was missing from her apartment. Love was not found as a result of the missing person's report.

On 13 March 1994, defendant confessed to the murder of Caroline Love. At trial, the State introduced redacted versions of defendant's tape-recorded confession. In the confession, defendant stated that he made a copy of McKnight's house key and

3

went to the apartment when neither McKnight nor Love was there. Defendant heard Love enter the apartment. He indicated to Love that he was in the bathroom and would leave as soon as he came out. Upon coming out of the bathroom, however, defendant went into the living room where Love was watching television and kissed her on the cheek. Love promised not to tell McKnight about the kiss if defendant promised not to do it again. Defendant then put his arms around Love in a manner similar to a wrestling choke hold. Defendant confessed that there was a scuffle, that Love scratched him on his arms and face, and that he kept holding Love until she passed out. Defendant then moved Love to her bedroom, removed her clothes, tied her hands behind her back with the cord of a curling iron, and placed tape over her mouth. Defendant had oral sex and sexual intercourse with Love, during which she was semiconscious. While engaged in intercourse with Love, defendant continued to apply the choke hold until Love's body became limp. Defendant stated he could tell she was still alive because he could feel her heart and pulse. Afterwards, defendant strangled Love to death.

Defendant further confessed that he left the apartment to move his car closer to the stairwell and then returned to the apartment with a large orange trash bag. Defendant wrapped Love's body in a bed sheet and put the body inside the trash bag. . . . Defendant carried the bags down the stairs, placed them in the backseat of his car, and then drove around Charlotte trying to find a place to dump Love's body. Defendant . . . dumped the bag into the woods. The following day, defendant drove back to the location because he feared the orange bag would be noticeable from the road. Defendant stated that he removed the body from the orange trash bag and then moved the body into a shallow ravine. Defendant also admitted taking a roll of quarters from Love's dresser.

Later on 13 March 1994, after defendant's confession, defendant directed Rice and other investigators to the site where he had dumped Love's body. Subsequently, Dr. Michael Sullivan, a forensic pathologist and medical examiner . . . went to . . . recover Love's skeletal remains. Dr. Sullivan

4

performed an autopsy on those remains. . . . Dr. Sullivan determined that the cause of death was homicide by means of strangulation.

## Shawna Hawk Murder

In February 1993, Shawna Hawk was living with her mother, Sylvia Denise Sumpter, in Charlotte. Hawk was a paralegal student at Central Piedmont Community College and worked at a Taco Bell restaurant . . . where defendant was her manager. On 19 February 1993, Sumpter arrived home . . . . Hawk's car was not there, but Sumpter saw Hawk's coat and purse in a closet. This seemed unusual because it was very cold outside, Hawk never went anywhere without her purse, and Sumpter had seen Hawk earlier in the day wearing the coat. Sumpter called Hawk's boyfriend, Darryl Kirkpatrick, to ask if he had seen Hawk, but Kirkpatrick said he had not.

Sumpter then learned that Hawk was to have picked up her godson from daycare but had not done so. Sumpter looked through Hawk's purse and noticed that her keys were not there and that some money was missing. . . . Kirkpatrick and Sumpter decided to file a missing person report and called the police. Subsequently, Kirkpatrick walked through the house looking in each room. He entered a bathroom downstairs and noticed the shower curtain outside the bathtub. When Kirkpatrick pulled the shower curtain back, he saw Hawk curled up and submerged in water . . . . Emergency personnel arrived, tried to resuscitate Hawk, and then transported her to the hospital, where she was pronounced dead.

On 20 February 1993, Dr. Sullivan performed an autopsy on Hawk's body. . . . Based on his observations, Sullivan opined that the cause of Hawk's death was ligature strangulation.

Defendant confessed that he stopped by Hawk's home to see her and that they talked for a while. As defendant was leaving, Hawk gave him a hug. Defendant then told Hawk he wanted her to have sex with him. Defendant took Hawk to her bedroom, told her to remove her clothing, and told her to perform oral sex on him, which she did. Then, defendant performed oral sex on Hawk. The two then engaged in sexual intercourse.

5

Defendant admitted that Hawk was afraid and cried the whole time. Afterwards, defendant told Hawk to put her clothes on, and he took her into the bathroom. Defendant placed Hawk in a choke hold, with her head between his arms, until she passed out. Defendant then filled the bathtub with water and placed Hawk in it. Defendant also admitted taking fifty dollars from Hawk.

### Audrey Spain Murder

On 23 June 1993, [Audrey] Spain was to report to work at 6:30 pm at a Taco Bell restaurant . . . . Spain did not show up for work. Mark Lawrence, Spain's manager, thought it was unusual for Spain not to come to work, so he drove by Spain's apartment that evening. Lawrence saw Spain's car in the parking lot. Lawrence then called Spain and left a message on her answering machine.

The next morning, 24 June 1993, Lawrence rode by Spain's apartment and again saw her car in the lot. . . . Spain did not show up for work that evening. . . . Lawrence called 911. Thereafter, officers periodically rode by the apartment and knocked on the door, but got no response.

On 25 June 1993, maintenance personnel from the apartment complex entered the apartment . . . and discovered Spain's body on the bed. . . .

On 26 June 1993, Dr. Sullivan conducted an autopsy on Spain's body . . . . Dr. Sullivan opined that the cause of death was strangulation.

Defendant confessed that he went to Spain's house and that they smoked marijuana together. Defendant admitted that his motive for visiting Spain was robbery. He stated that he put Spain in a choke hold in her living room and inquired about the combination for the safe at her workplace, but she said she did not know the combination. Defendant also asked about money in her personal bank account, but she said she did not have any money . . . .

Defendant said he did not remember asking Spain to remove her clothes. Spain begged defendant not to hurt her, but defendant maintained the choke hold

6

until Spain passed out.  Defendant then dragged Spain into her bedroom and had intercourse with her. Afterwards, defendant took Spain into the bathroom, where he put her into the shower to wash off any evidence.  Defendant placed Spain into her bed and tied a T-shirt and bra around her neck.  Before leaving, defendant took Spain's keys and Visa credit card.  He used the Visa card to purchase gas. Defendant returned to Spain's apartment to make phone calls so it would seem as though she had not died on the day defendant killed her.

## Valencia Jumper Murder

In August 1993, Valencia Jumper was a senior at Johnson C. Smith University in Charlotte, studying political science. She also worked at Food Lion . . . and at Hecht's . . . .  On 9 August 1993, a friend of Jumper's, Zachery Douglas, spoke with Jumper on the phone about meeting later that night. Subsequently, Douglas arrived at Jumper's apartment in the early morning hours of 10 August 1993 and noticed smoke coming from her apartment . . . .

As firefighters arrived on the scene . . . firefighter Dennis Arney entered the kitchen and noticed that a burner on the stove had been left on. Based on examinations at the fire scene, the information provided by firefighters, and the observed pattern the fire traveled, the investigators believed the fire originated from a pot left burning on the stove.  Firefighters found Jumper's body in the bedroom of  her apartment.

On 10 August 1993, Sullivan performed an autopsy on Jumper's body. . . .  [H]e found no soot in Jumper's airway, indicating there was no significant inhalation of smoke during the fire.  After learning there was no carbon monoxide in Jumper's blood, Dr. Sullivan listed thermal burns as the cause of death. After defendant's confession, Dr. Sullivan reexamined the Jumper autopsy and amended the cause of Jumper's death.  Dr. Sullivan testified that the cause of Jumper's death was strangulation.

Defendant confessed to Jumper's murder . . . . On the night in question, defendant stated that he stopped by Jumper's apartment and that they talked for

7

a while and then defendant left. Defendant later returned to Jumper's apartment and asked her to call McKnight because they had gotten into a fight. When Jumper reached toward the phone, defendant put her in a choke hold. Defendant told Jumper to go to the bedroom. Jumper begged defendant not to hurt her and stated she would do anything he wanted. Jumper removed her clothes. Defendant and Jumper engaged in oral sex and sexual intercourse. Afterwards, while Jumper was putting her clothes back on, defendant put a towel around her neck and choked her until she passed out. Defendant stated that Jumper started bleeding from the nose, so he kept the pressure on the towel for about five minutes until he felt no pulse. Then defendant wiped his fingerprints from certain areas of the apartment. Defendant went into the kitchen and noticed a bottle of rum, so he took the bottle to the bedroom and poured the rum on Jumper's body, on the bed, and on the floor nearby. Defendant then went back into the kitchen, opened a can of beans, put the beans in a pot on the stove, and turned the stove on high. Defendant took the battery out of the smoke detector. Defendant went back into the bedroom, lit a match, and threw it on Jumper's rum-soaked body before leaving the apartment. Defendant returned to the apartment twenty minutes later. When he saw smoke rushing out the door, he left and went home. Defendant admitted taking jewelry from Jumper's body and pawning it in a local pawn shop.

### Michelle Stinson Murder

In September 1993, Michelle Stinson, age twenty, lived in an apartment in Charlotte, with her two young sons. On 15 September 1993, Stinson's friend, James Mayes, stopped by her apartment to visit . . . . Mayes knocked on the front door, but no one answered. Mayes heard the children knocking on the window and telling him their mother was sleeping on the kitchen floor . . . . Mayes had turned to leave when the oldest child came out the back door and grabbed him. Mayes picked up the child and went back into the apartment through the back door. Mayes discovered Stinson lying on the kitchen floor with blood around her. Mayes picked up the phone but realized the cord had been cut or jerked out of the wall. Mayes took the

children and asked the neighbors to help him find a phone. He then called the police.

Dr. Sullivan performed an autopsy on Stinson's body on 16 September 1993. . . . Dr. Sullivan opined that the cause of Stinson's death was stab wounds to the chest with strangulation as a contributing cause.

Defendant confessed that he stopped by Stinson's apartment around 11:00 pm, with the intention of raping and murdering her. They talked for a while, and then defendant got ready to leave and they hugged. At that point, defendant told Stinson that he wanted to have sex with her and that he wanted her to remove her clothes. Stinson told defendant she was sick, but defendant did not believe her . . . . Defendant began to choke Stinson. Stinson then agreed to have sex with defendant and removed her clothes. Defendant told Stinson he wanted her to perform oral sex on him, but she stated she did not know how. Defendant responded, "well you're about to learn." Stinson then performed oral sex on defendant. After having sexual intercourse on the kitchen floor, defendant administered a choke hold until Stinson became unconscious. Defendant strangled Stinson with a towel he had retrieved from the bathroom. Stinson began to gasp for air, so defendant took a knife and stabbed her approximately four times. Defendant used a washcloth to wipe his fingerprints from a glass, the door, the phone, the wall, and the floor. Before defendant left the apartment, Stinson's oldest son awoke and defendant told him to go back to bed. Defendant left through the back door, using a towel to avoid leaving fingerprints, and threw the knife and washcloth over a fence near the back of Stinson's apartment.

## Vanessa Mack Murder

In February 1994, Vanessa Mack was living in an apartment in Charlotte with her two young daughters. She worked at Carolinas Medical Center. On 20 February 1994, Barbara Rippy, the grandmother of Mack's oldest daughter, went to Mack's apartment to pick up Mack's youngest daughter . . . . Rippy arrived at 6:00 am and went to the back door, but the door was ajar. Rippy called out, but Mack did not respond. As she entered, Rippy noticed Mack's four-month-old

9

daughter lying on the couch, which she felt was unusual. Rippy entered the bedroom and saw Mack's feet hanging off the side of the bed. . . . Rippy called 911. Rippy then picked up Mack's daughter and went outside . . . .

Officer Jeffrey Bumgarner of the Charlotte-Mecklenburg Police Department found Mack lying on her bed. Bumgarner observed a towel around Mack's neck and blood coming from her nose, ears, and the back of her head. Bumgarner also noticed a pocketbook, with its contents scattered on the bed.

Dr. Sullivan performed an autopsy on Mack's body on 21 February 1994. . . . Dr. Sullivan opined that the cause of Mack's death was strangulation.

Defendant confessed that he had been in Mack's neighborhood and had called to see if she was at home. When she answered, he hung up the phone. He then walked over to her apartment. Defendant admitted that his motives for going to see Mack were robbery, to support his cocaine addiction, and murder. Defendant stated that he tried to find a way to maneuver Mack into the position he needed in order to administer a choke hold, but she refused to give defendant a hug, so he asked for something to drink. When Mack turned her back, defendant pulled out a pillowcase he had brought with him and placed it around her neck. As Mack resisted, defendant put more pressure on the pillowcase and explained that this was a robbery. Defendant and Mack went into the bedroom, where defendant commanded Mack to give him all the money she had, including her . . . (ATM) card and . . . (PIN). After Mack gave defendant everything, he told her to remove her clothes, which she did. Defendant and Mack engaged in sexual intercourse. Afterwards, defendant told Mack to put her clothes back on. Defendant then tightened the pillowcase around Mack's neck until she passed out. Defendant added another garment to keep the pillowcase from loosening. Defendant then checked on Mack's baby and stayed until the baby went to sleep. . . . Later, defendant attempted to use the ATM card at several banks and discovered that the PIN given to him by Mack was not correct.

10

Betty Baucom Murder

In March 1994, Betty Baucom lived in an apartment in Charlotte with her adopted daughter. On 9 March 1994, Baucom, an assistant manager at the Bojangles' restaurant . . . was scheduled to work, but she did not report to work. Baucom's unit director, Jeffrey Ellis, called Baucom's apartment several times but received no answer. . . .

The next morning, Ellis became increasingly worried because Baucom was again scheduled to work but did not report. Neither Baucom's mother nor Baucom's aunt had heard from Baucom. Ellis and another employee drove to Baucom's apartment . . . . They knocked on the door and looked in the windows, and everything appeared normal . . . . Ellis and Baucom's mother decided to contact the police department, and they identified Baucom as a missing person.

Officer Gregory Norwood of the Charlotte-Mecklenburg Police Department received a call on the morning of 10 March 1994 to respond to an apartment where a young woman had been found. She was not breathing . . . . Norwood discovered Baucom's body lying facedown with a towel around her neck. . . .

Dr. Sullivan performed an autopsy on Baucom's body on 11 March 1994 . . . . He testified that the injuries were consistent with a struggle. Dr. Sullivan opined that the cause of Baucom's death was strangulation.

Defendant confessed that he went to Baucom's apartment and told her he needed to use the phone. Baucom let defendant into her apartment. They talked for a while. As defendant was getting ready to leave, he placed a choke hold on Baucom, and she fell to the floor. Defendant told her this was a robbery and demanded the alarm code, keys, and combination to the safe for the Bojangles' restaurant . . . . Baucom was very upset, and she took approximately thirty minutes to produce the safe's combination. Defendant then released the choke hold. Defendant remembered Baucom asking, "Why did you do that to me?" Defendant responded that he was a sick person and that he had hurt many people. Baucom then embraced defendant, said that she forgave him, and told him he needed

help.  Defendant became enraged and grabbed Baucom by the throat, slammed her to the floor, and then scuffled with her.  Defendant got Baucom to her feet and took her into the bedroom, where he told her to remove her clothes . . . .  Defendant then told Baucom he wanted her to perform oral sex on him. She grabbed his penis and started pulling and scratching. Defendant and Baucom began to scuffle again . . . . Defendant was able to tighten the towel around Baucom's neck until she was nearly unconscious.  At this point, Baucom removed her clothes and engaged in sexual intercourse with defendant.  Afterwards, defendant told Baucom to put her clothes back on. He then placed a towel around her neck and asked her if she had any money.  Baucom gave defendant the money in her purse, and he  took a gold chain from around her neck.

    After strangling Baucom to death, defendant took her television and left in her car. Defendant sold the television for drugs.  He then returned to Baucom's apartment to make sure Baucom was dead and to take her VCR.  While in Baucom's apartment, defendant used a wet cloth to wipe off the phone, door knobs, and the wall on which some of the struggle took place. Defendant used money from Baucom's purse, the gold chain, and the VCR to purchase more drugs. . . . Defendant then left [her] car in a parking lot, because he thought police were following him. Defendant stated that he wiped the interior and most of the exterior of the car, but forgot to wipe the trunk lid.

## Brandi Henderson Murder

    In March 1994, Brandi Henderson was living in an apartment with her boyfriend, Verness Lamar Woods, and their ten-month-old son, T.W. On 9 March 1994, Woods was at the apartment taking care of T.W. because Henderson had a doctor's appointment.  As Henderson was leaving, defendant went to the apartment to say he was leaving town.  Defendant stayed for only a few minutes and then left.  Henderson returned during the afternoon . . . .  When Woods left, Henderson and T.W. were alone in the apartment . . . .  Woods returned to the apartment around midnight to find the front door unlocked, items scattered about the living room, and

12

the stereo missing. Woods then went through the apartment. He first came to T.W.'s bedroom where he turned on the light and saw T.W. sitting on the bed gasping for air with something white coming out of his mouth and a pair of shorts around his neck. Woods immediately ran to T.W. to remove the shorts . . . . Woods then realized that Henderson was lying facedown on the bed. Woods rolled her onto her back and saw that towels were tied around her neck and that her face was blue. Woods removed the two towels from Henderson's neck and then called 911. He moved Henderson's body from the bed to the floor and began administering CPR pursuant to instructions from the 911 operator. When police officers arrived, it was obvious Henderson was dead. T.W. was taken to the hospital.

. . . Dr. Tom Brewer examined T.W. in the emergency room. Dr. Brewer testified that T.W. was awake, breathing, and had stable vital signs. However, his failure to pull away when struck with a needle was some evidence that he was not acting normally . . . . Dr. Brewer testified that he believed the ligature and T.W.'s injuries caused great pain and suffering.

Dr. Sullivan performed an autopsy on Henderson's body on 10 March 1994. . . . Dr. Sullivan opined that the cause of death was strangulation.

Defendant confessed that he planned to murder Henderson on Tuesday morning, but when he arrived at the apartment, Woods was present. Defendant left the apartment, found Baucom's apartment in the same apartment complex, and murdered Baucom. He returned to Henderson's apartment the same night when he knew Woods would be at work. . . . Henderson and defendant talked for a while, and then defendant asked for something to drink. When Henderson reached into the cabinet, defendant choked her and told her to go into the bedroom. Henderson begged defendant to allow her to hold her son, but he said, "I don't know if that would be a good idea for what we're about to do." Defendant told her this was also going to be a robbery and demanded money. Henderson gave defendant . . . approximately twenty dollars worth of coins and said there was no other money in the house. Defendant also told Henderson he would be taking the television and

13

stereo when he left. Defendant then told Henderson to remove her clothes, which she did. Henderson grabbed her son, laid him across her chest, and turned his head away so that he could not see what was going on. Defendant and Henderson started to have sexual intercourse in Henderson's bedroom but moved to T.W.'s bedroom so he would not cry. Once in T.W.'s room, defendant and Henderson continued to have sexual intercourse, with T.W. lying across Henderson's chest. Afterwards, defendant told Henderson to put her clothes back on . . . . Defendant went into the bathroom, got a towel, and wiped off everything. Thereafter, defendant folded the towel, put it around Henderson's neck, and strangled her to death. Henderson's body fell to the floor. Defendant picked up Henderson's body and put it onto T.W.'s bed. He also tied the towel in a knot around her neck. T.W. started crying, so defendant gave him a pacifier. . . . Defendant then took another towel from the bathroom and tied it tight around T.W.'s neck so it would be difficult for him to breathe and so he would stop crying. T.W. stopped crying and laid down next to his mother's body. Defendant then ran into the living room, disconnected the stereo, and loaded it into Baucom's car. Defendant also took a television . . . . Defendant sold the television and stereo for $175.000 which he used to purchase crack cocaine.

## Deborah Slaughter Murder

In March 1994, Deborah Slaughter lived alone in an apartment in Charlotte. On 12 March 1994, Slaughter's mother, Lovey Slaughter (Lovey), went to Slaughter's apartment . . . . Lovey had a key to the apartment . . . . When Lovey arrived, she knocked on the door and got no response. She put the key into the lock and discovered the door was not locked. As Lovey walked through the door, she saw Slaughter's body lying on the floor . . . .

Officer Ronnie Chambers of the Charlotte-Mecklenburg Police Department entered Slaughter's apartment and found a purse with its contents scattered on the floor. Chambers then noticed Slaughter's body lying on the floor faceup. There was white fabric in Slaughter's mouth and a towel around

her neck. Chambers also observed several puncture wounds in Slaughter's chest.

On 14 March 1994, Dr. Sullivan performed an autopsy on Slaughter's body . . . . Dr. Sullivan opined that Slaughter's death was caused by multiple stab wounds, with strangulation as a contributing factor in the death.

Defendant confessed that he went to Slaughter's apartment to use drugs with her. . . . Defendant asked Slaughter to get him something to drink. As Slaughter turned around, defendant put a towel he brought with him around Slaughter's neck and tightened it. Slaughter fell to her knees. Defendant stated that Slaughter then realized that defendant was the one who had killed two other girls in nearby apartments. Defendant told Slaughter to remove her clothes and perform oral sex on him. Defendant remembered Slaughter saying, "I don't do that; you might as well go ahead and kill me." Defendant tightened the towel and asked if she wanted to change her mind. Slaughter stated that she would not perform oral sex on defendant. Defendant engaged in sexual intercourse with Slaughter. Afterwards, defendant told Slaughter to put her clothes on. Defendant, knowing Slaughter carried a knife in her purse at all times, asked Slaughter to empty the contents of her purse . . . . Defendant kicked the knife away and then told Slaughter to open the wallet and give him everything in it. As Slaughter did this, defendant grabbed the knife. . . . Slaughter hit defendant and screamed for the police. Defendant then tightened the towel around Slaughter's neck until she fell to the floor and started kicking. Defendant tightened the towel more and tried to sit on top of Slaughter's legs to keep Slaughter from alerting the neighbors downstairs. Defendant went to the bathroom to retrieve another towel, which he tied with the first around Slaughter's neck. Defendant stabbed Slaughter with the knife approximately twenty times in the abdomen. Defendant then washed the knife clean and wiped his fingerprints from it . . . .

State v. Wallace, 528 S.E.2d 326, 331-40 (N.C. 2000).

15

B.

On the evening of March 12, 1994, two Charlotte-Mecklenburg police officers arrested Wallace on an outstanding larceny warrant. Wallace was a suspect in some of the murders described above at the time of his arrest. Rather than take him to the Intake Center, where arrestees on a single charge were typically taken, the officers took Wallace to the Law Enforcement Center for questioning about the murders. Investigators Mark Corwin and Darrell Price began questioning Wallace at around 6:43 p.m. To establish a rapport with Wallace, Corwin and Price asked him about his background, sports, and his military and employment history. The trial court found that the investigators did not elicit incriminating information during this initial period of questioning. Wallace voluntarily raised his drug addiction and his acquaintance with victims Brandi Henderson and Betty Baucom. The investigators provided Wallace with regular breaks, food, and drink during this first phase of questioning. Corwin testified that Wallace was held for three hours and fifteen minutes before being given Miranda warnings, though Wallace was not questioned continuously during this period due to several breaks. Corwin stated that the investigators waited to advise Wallace of his rights because they wanted to "establish[] a good enough rapport with [Wallace] so that he would continue to cooperate;" they did not "want to

16

throw up a roadblock in [the] interview process by mentioning attorneys and lawyers and remaining silent." J.A. 1374, 1376. Corwin acknowledged, however, that "[o]nce we plan to start the interrogation process we have to advise them." J.A. 1376.

At approximately 10:00 p.m. on March 12, Corwin and Price read Wallace his <u>Miranda</u> rights. Corwin testified that Price read the rights from a standard form. Wallace indicated that he understood each right and initialed the form. Corwin also stated that Wallace read the rights aloud without difficulty and never indicated that he had trouble understanding them or needed further explanation. Price testified that Wallace was alert both before and after he signed the waiver. After the rights advisement and waiver, Corwin and Price asked Wallace more specific questions about his relationship with the murder victims.

Investigator Price left the room and Investigator C.E. Boothe entered. Boothe asked Wallace if he was involved in the deaths of Betty Baucom and Deborah Slaughter. Wallace responded that he knew the women but was not involved in their deaths. Boothe then told Wallace that fingerprints taken from Baucom's car matched Wallace's fingerprints. Boothe testified that Wallace did not respond to this statement, but that he became very emotional and formed tears when shown a prior arrest photograph of himself. Wallace told Boothe that he felt he was

17

being accused of murdering women. Boothe said that Wallace then discussed his drug addiction and his problems with his girlfriend, Sadie McKnight. As Wallace continued to cry, Boothe told Wallace he (Boothe) "felt he knew who [Wallace] needed to talk to." J.A. 1554. Boothe was referring to "Jesus or to the Lord." Id. Boothe then left the room to speak with Corwin and Price.

At around 5:07 a.m. on March 13, Investigator Tony Rice entered Wallace's interview room. He also discussed Wallace's drug addiction and relationship with McKnight. Rice asked if he could say a prayer. After Wallace agreed, Rice held Wallace's hand and asked "our heavenly father" to "lead us, guide us, and direct us as we discuss this most serious issue," and to "forgive us of our sins and cleanse us through the blood of Jesus." J.A. 1855. Rice testified that it was not unusual for him to pray with arrestees during interrogations and that he made up this particular prayer. Rice said that Wallace cried after the prayer, breathed a "sigh of relief," and wrote down the names of all his victims. J.A. 1640. According to Rice, the prayer's purpose was to prompt Wallace to "start telling the truth" but not to "confess." J.A. 1886.

After Wallace made his list, investigators asked if they could record his statements, and Wallace agreed. The recording started around 5:56 a.m., and Wallace gave detailed

18

confessions to the nine murders. Wallace took a break to sleep at around 7:30 a.m., and during the break the police went to a magistrate and obtained murder warrants. Afterwards, Wallace accompanied the police on a van ride to show them the locations of the bodies of Caroline Love and another woman, Sharon Nance.[1] In his statements recorded at the Law Enforcement Center and on the van ride, Wallace gave detailed confessions to each murder and repeatedly indicated that he had been advised of his rights but still wished to talk with the police. Wallace said that he had not been threatened or coerced and that he had "gotten the truth off . . . . Now these people's families will know . . . . I'm grateful that it's over now and I don't have to live with it anymore." J.A. 2181, 2189.

The trial court admitted the confessions, finding no evidence that Wallace was coerced or that he had ever expressed a desire to stop talking or speak with a lawyer. The court also found that the officers did not elicit any incriminating information prior to administering <u>Miranda</u> warnings. Although the trial court observed that at some point during the interrogation, Wallace requested to see his girlfriend and hold his daughter, the court concluded that the police did not

---

[1] The state chose not to prosecute the Sharon Nance murder with the nine others. <u>Wallace v. Polk</u>, No. 3:05cv464-C, 2008 U.S. Dist. LEXIS 36679, at *25 n.2 (W.D.N.C. May 5, 2008).

19

interpret this request as a condition for giving a statement. Wallace said on tape that he did not view the arrangement of a final moment with his girlfriend as a mechanism to obtain a statement. He went on to say that he had "wanted to tell the story for a long time," that if he had not "told [the police] . . . the killing would have continued and probably I would have killed myself as well." J.A. 2183.

C.

On March 13, 1994, the day after Wallace's arrest, the Charlotte-Mecklenburg Police Department held a press conference. Deputy Chief Jack Boger announced that the police "believe[d] they ha[d] the man responsible" for several murders and that the "community should feel some sense of relief." J.A. 693. Boger also confirmed that Wallace had led police to the remains of Caroline Love. Deputy Chief Larry Snider told reporters at the press conference that Wallace was cooperating with the investigation. Snider also said that Wallace was a suspect in the murders of three other women. (There was no physical evidence linking Wallace to those murders, and he was never charged with them.)

Subsequent press coverage of Wallace's arrest was extensive. It included a typical serial killer profile. Some of the press described past criminal investigations of Wallace, while other articles described the shocked reactions of those

20

who knew Wallace and considered him an "ordinary person." J.A. 514. Much of the press stemmed from criticism of the Charlotte-Mecklenburg police for failing to apprehend Wallace sooner given the similarity of the crimes, their proximity to one another, Wallace's employment connection to several of the victims, and his past sex-crime charges. Commentators suggested that the police did not aggressively pursue an investigation because the victims were African American. The police responded by describing Wallace as someone who had "been around policemen enough to know how they worked" and who took "great pains" to remove physical evidence from crime scenes. J.A. 535. Two headlines labeled Wallace a "clever suspect" and a "charmer." J.A. 535, 540. Some of the statements conveyed the police department's conviction that Wallace was linked to several of the murders based on physical evidence recovered at the scenes.

On August 9, 1994, Wallace moved for a change of venue on the grounds that the extensive pretrial publicity surrounding his case presumptively rendered prospective jurors prejudiced against him. At the motion hearing in January 1995, Chief Boger confirmed that many of the police officers' press statements were in response to public criticism. Boger said that some of the information released to combat criticism would otherwise have remained unavailable to the public until trial. Sergeant Rick Sanders testified that he was concerned about whether these

21

press statements might taint the trial and that the district attorney's office discouraged further press conferences. Defense counsel offered the testimony of criminal justice professor Dr. Robert M. Bohm, who concluded from a poll he designed that a majority of the population from which the jury would be drawn had already deemed Wallace guilty.

In denying the motion to change venue in January 1995, the trial court acknowledged that Wallace "received widespread, and at times inflammatory coverage from the news media in Mecklenburg County and surrounding counties." J.A. 1051. The court found that Wallace was the subject of sixty-four stories in the Charlotte Observer between March 13, 1994, and May 10, 1994, and that local television stations aired roughly 174 stories during the same period. Although some of the coverage was inflammatory and misleading, the court concluded that some of it was favorable to Wallace and much of it was factual and informative rather than inflammatory. The court characterized the statements of senior officers as "motivated in part [by] a desire to provide information to allay public fears, to quiet rumors, and to explain the conduct of the police department." J.A. 1054. The court found "no evidence that any police representative knowingly released false information, or information known to be misleading." J.A. 1054. Finally, the court concluded that Dr. Bohm's survey was not probative of

22

prejudice. Because Mecklenburg County was large (a voting-age population of 350,000) and diverse, the court found it more likely that prospective jurors would base their conclusions on trial evidence than pretrial publicity. The court determined that voir dire examination was the most efficient means of remedying any prejudice of pretrial publicity.

During voir dire in October 1996, nine of Wallace's twelve jurors admitted exposure to pretrial publicity about the case. All nine stated that their exposure was limited to the time period between the murders and Wallace's arrest. Of the nine, three remembered nothing or were not asked what they remembered; the other six remembered only a few details, such as Wallace's name or the fact that some of the victims worked at restaurants. All nine avowed to decide the case solely on the evidence at trial.

## D.

The jury found Wallace guilty of the nine murders and related crimes and recommended death sentences, which the trial court imposed. The North Carolina Supreme Court affirmed his convictions and death sentences on direct appeal. The supreme court rejected Wallace's arguments that the denied motion to change venue and the admission of his confessions violated his constitutional rights. In November 2001 Wallace filed a motion for appropriate relief (MAR) in the Superior Court of

Mecklenburg County.  After a three-day evidentiary hearing in August 2004, the MAR court denied Wallace's claims.  Wallace did not raise the pretrial publicity and Miranda claims before the MAR court, though he did raise these claims on direct appeal to the North Carolina Supreme Court in 2000.  After the MAR court denied relief, the North Carolina Supreme Court denied his petition for certiorari on November 5, 2005.  Wallace petitioned for a writ of habeas corpus in the Western District Court of North Carolina on November 8, 2005.  The district court rejected all of his claims.  We granted a certificate of appealability on the pretrial publicity and involuntary confession claims.  Wallace appeals.

## II.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, a federal court exercising collateral review of criminal claims adjudicated on the merits in state courts accords great deference to a state court's legal conclusions and factual findings.  We must deny habeas relief unless the state adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

24

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to the Supreme Court's. Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court unreasonably applies federal law when it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular . . . case." Id. at 407-08. A state court also unreasonably applies federal law when it "applies a precedent in a context different from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable," or when it "fails to apply the principle of a precedent in a context where such failure is unreasonable." Robinson v. Polk, 438 F.3d 350, 355 (4th Cir. 2006) (internal citations omitted). Further, a state court's factual findings are presumed correct and may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). We review de novo a district court's application of these principles. Robinson, 438 F.3d at 354.

Wallace contends that the North Carolina state court reached decisions that were contrary to, and an unreasonable application of, federal law when it determined that (1) denying his motion to change venue based on pretrial publicity did not deprive him of an impartial jury under the Sixth Amendment, and (2) his confessions were voluntary and not obtained amidst circumstances calculated to undermine his free will.

A.

Wallace argues that the pretrial publicity surrounding his arrest was so widespread and inflammatory that a jury drawn from the community should have been presumed partial regardless of responses given during voir dire. Supreme Court precedent sets a high bar for presumed prejudice on the basis of pretrial publicity. For a jury to be presumed partial by pretrial publicity, the publicity must involve coverage that is almost irrefutably incriminating and proximate in time to the trial, or the publicity must disturb the trial proceedings. The publicity must rise to a level that renders court proceedings "a hollow formality." Rideau v. Louisiana, 373 U.S. 723, 726 (1963).

In Rideau residents of a town with a population of 150,000 were repeatedly exposed to a film clip of a defendant personally confessing to murder. Id. at 724. The Supreme Court presumed juror prejudice based on the spectacle of a broadcast confession by the defendant himself. Id. at 726. The clip was

26

shown two months before the defendant's trial.  Id.  The Court also found presumed prejudice in Irvin v. Dowd, 366 U.S. 717, 725 (1961), a case in which the defendant was the subject of a "barrage of newspaper headlines, articles, cartoons and pictures" six months before his trial.  The coverage reported that the defendant confessed to six murders and offered to plead guilty to avoid the death penalty.  Id. at 725-26.  The publicity also characterized the defendant as "remorseless and without conscience."  Id. at 726.  The unabated publicity convinced the Court that jurors' "statement[s] of impartiality [during voir dire] [could] be given little weight."  Id. at 728.

Other Supreme Court decisions indicate that jurors may be presumed prejudiced by publicity that infects the actual trial proceedings.  In Estes v. Texas, 381 U.S. 532, 535-36 (1965), the Court found presumed prejudice in a case of national notoriety in which the press attended and televised pretrial hearings, undermining the courtroom's atmosphere of decorum with obtrusive cables, wires, and microphones.  Similarly, in Sheppard v. Maxwell, 384 U.S. 333 (1966), the Court found presumed prejudice in the nationally known murder trial of Sam Sheppard.  Not only was there pervasive publicity from the outset characterizing Sheppard as the murderer, but the press took on the air of theater.  Reporters broadcasted a staged inquest presided over by the coroner and prosecutor and attended

27

by hundreds of spectators.  Id. at 339.  At trial the press was a constant presence inside and outside the courtroom.  Jurors' photographs were published.  Id. at 345.  The jury visited the murder scene in the presence of hundreds of reporters.  The jury was not sequestered and was only admonished to avoid press coverage during the trial.  Id. at 347, 353.

When pretrial publicity does not reach an amplitude that makes trial "a hollow formality," voir dire examination is the trial court's metric of juror partiality.  Murphy v. Florida, 421 U.S. 794 (1975).  If voir dire "indicates no such hostility to [a defendant] by the jurors . . . as to suggest a partiality that could not be laid aside," then pretrial publicity has not deprived the defendant of a fair trial.  Id. at 800.  Jurors are not expected to be "totally ignorant of the facts and issues involved," and even a juror's preconceived conclusion on guilt will not alone rebut the presumption of impartiality if the trial court is satisfied that the juror "can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  Id. (citing Irvin, 366 U.S. at 723).  Additionally, the Supreme Court has noted the distinction between "mere familiarity with [a defendant] or his past and an actual predisposition against him," and between "largely factual publicity from that which is invidious or inflammatory."  Id. at 801 n.4.

28

Wallace argues that the state court did not address his motion to change venue under the Supreme Court's precedent governing presumed prejudice, but instead went straight to actual prejudice by discussing voir dire. Although the court did not explicitly address Rideau, Irvin, Estes, or Sheppard in its ruling, a "state court's disposition of a claim need not include extended analysis to qualify as an 'adjudication on the merits' under section 2254(d)." Walker v. True, 401 F.3d 574, 579 n.1 (4th Cir. 2005). The record indicates that the state court reasonably applied the Supreme Court's preference for voir dire as the mitigating tool of pretrial publicity after implicitly finding that Wallace's pretrial publicity did not meet the high bar required for presumed juror prejudice. After finding that the publicity was more factual than inflammatory, a distinction that the Supreme Court recognizes, Murphy, 421 U.S. at 801 n.4, the trial court went on to note that "jurors' responses to the questions on Voir Dire are the best evidence of whether pretrial publicity was inflammatory or prejudicial." J.A. 1055. The court concluded its ruling by noting Wallace's "right to renew the motion, because of subsequent events or because of information elicited during Voir Dire." J.A. 1056. This suggests the state court understood that further publicity shortly before jury selection might create presumed prejudice.

The state court could reasonably conclude that the pretrial publicity did not make Wallace's trial a hollow formality. In a case involving nine brutal, similar murders in a relatively short time span in the same geographic area, it would be a tall order to assemble a jury that had heard nothing about the case. Of course, the high-profile nature of Wallace's case gave the trial court reason to consider his motion for changed venue even more carefully, and we are satisfied that the court did so.

Most importantly, the time gap between the bulk of the publicity and the trial was substantially longer in Wallace's case than in Rideau. Wallace's trial was nearly two years after the surge of publicity, whereas Rideau's trial occurred less than two months after his broadcast confession. When it denied Wallace's motion to change venue at the hearing in January 1995, the state court could have reasonably concluded that the prejudicial effects of pretrial publicity would dissipate by the time jury selection would begin in October 1996.[2] Additionally,

---

[2] The North Carolina Supreme Court observed that although the trial court referenced the passage of time in its findings of fact, it did not explicitly rely on this rationale in denying the motion. State v. Wallace, 528 S.E.2d 326, 345 (N.C. 2000). We agree with the supreme court, however, that the trial court factored time into its conclusion as part of the "totality of the circumstances." J.A. 1056. In rejecting the probative value of Dr. Bohm's poll, the trial court explained that the "passage of time and the publicity or lack thereof after the
(Continued)

30

prospective jurors in Wallace's case, unlike those in Rideau, were not presented with Wallace's taped confession in news broadcasts.

We also conclude that the state court did not make an unreasonable determination of the facts when it concluded that most of Wallace's pretrial publicity was factual, not inflammatory. We must presume this factual finding correct, 28 U.S.C. § 2254(e)(1), and Wallace has failed to rebut it by clear and convincing evidence. Although Wallace's arrest was followed by some provocative and conclusory press – such as the serial killer profile and the portrayal of Wallace as a clever suspect who destroyed evidence – we agree that most of the coverage was factual. Much of it focused on the victims and the family and friends who mourned them. Although the coverage of Wallace's prior arrests was certainly unfavorable, it was also factual. And even if Wallace was not charged with some of the crimes mentioned, the fact that police believed that he was connected to the crimes is not necessarily inflammatory.

While we do not discount the prejudicial effects of hasty and confident statements made by a police department facing public criticism, we also cannot discount the right of

pole [sic] was taken, could amelierate [sic] or exacerbate the responses to the questions . . . ." J.A. 1055.

31

the department to communicate information to the public. Nor can we expect the press to discriminate between information that would be admissible and inadmissible at trial. In sum, the state court reasonably found that the pretrial publicity would not make Wallace's trial a hollow formality and that voir dire would provide the best indicia of prejudice. Unlike the prospective jurors in Rideau and Irvin, Wallace's jury pool did not encounter almost irrefutably incriminating information – such as a taped confession or a promised guilty plea – shortly before trial. Nor is there any indication that the publicity infected the trial itself as in Sheppard and Estes.

B.

Wallace's next claim is that the state court's admission of his confessions was contrary to, and an unreasonable application of, federal law. The investigators' delayed administration of Miranda warnings, Wallace argues, was a coercive tactic calculated to undermine his free will and render his confessions involuntary under the Fifth and Fourteenth Amendments.

Wallace argues that the applicable Supreme Court precedent for this claim is Missouri v. Seibert, 542 U.S. 600 (2004), rather than Oregon v. Elstad, 470 U.S. 298 (1985). Although Seibert was decided after Wallace's conviction became final, Wallace argues that the case did not announce a new rule

32

of constitutional law, but was rather a necessary consequence of Elstad. We need not decide this question because under either case, the state court reasonably applied the law to admit Wallace's confessions. Both cases involved suspects giving incriminating statements before being advised of their Miranda rights. Yet the state court here found that the police did not elicit incriminating information during the pre-warning period of questioning. Therefore, the question is whether the state court reasonably found under the totality of the circumstances that Wallace's subsequent confessions were voluntary. Moran v. Burbine, 475 U.S. 412, 421 (1986).

In Elstad the Supreme Court held that the failure to give Miranda warnings until after a suspect has given an incriminating statement does not necessarily render post-warning confessions inadmissible, provided that the post-warning statements are voluntary. 470 U.S. at 312. The Court underscored the "vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question." Id. Elstad voluntarily made an incriminating statement before police advised him of his rights. Id. at 315. The Court refused to extend Miranda to hold that "a simple

33

failure to administer the warnings, unaccompanied by 'any' actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period."  Id. at 309.

In Seibert the Court addressed the consequences of a deliberate rather than inadvertent delay of Miranda warnings.  A plurality held that when the delayed administration of Miranda warnings is deliberate and elicits a confession, it is unlikely that subsequent warnings serve their purpose because suspects presumably conclude that the pre-warning statement is admissible regardless.  542 U.S. at 613.  In concurrence, Justice Kennedy proposed that post-warning statements given after a deliberate delay should be excluded unless police employ curative measures, such as an additional warning explaining that the pre-warning statement is likely inadmissible.  Id. at 622. Because no rationale in Seibert garnered a majority, and Justice Kennedy concurred on the narrowest grounds, his opinion may be treated as the Court's holding.  Marks v. United States, 430 U.S. 188, 193 (1977).

Both Elstad and Seibert focus on warnings given after police have already elicited an admission.  The state court found that investigators Corwin and Price did not ask any

34

questions designed to elicit an incriminating response before administering warnings. See Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980) (defining "interrogation" for Miranda purposes as not only "express questioning," but "words or actions on the part of police . . . that the police should know are reasonably likely to elicit an incriminating response"). Wallace maintains that his statements regarding his drug abuse and acquaintance with Henderson and Baucom were incriminating because they were links in a chain of evidence against him, and that the police exploited these statements by immediately asking for more detail about Wallace's connection to the victims after they gave him the Miranda warnings. The case that Wallace cites to support this argument, Ohio v. Reiner, 532 U.S. 17 (2001) is inapplicable. Reiner addressed the reasonableness of witnesses' perceptions that their testimony is incriminating for the purposes of the Fifth Amendment's privilege against self-incrimination. Id. at 20. The Court held that the privilege extends to answers "which would furnish a link in the chain of evidence needed to prosecute." Id. Reiner thus speaks to what makes a statement sufficiently incriminating to allow a witness to assert the Fifth Amendment privilege; it does not define what constitutes interrogation for Miranda purposes. Interrogation is defined by police questioning and conduct designed to elicit

35

an incriminating response, not by a suspect's belief as to what statements are incriminating.

Because Miranda warnings are not required unless there is both custody and interrogation, 384 U.S. 436, 467-68 (1966), Wallace's argument that his post-warning suppression should have been suppressed must rest on the voluntariness of his waiver of his Miranda rights. A voluntary waiver is one that was "the product of a free and deliberate choice rather than intimidation, coercion, or deception" and was "made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran, 475 U.S. at 421. "Only if the 'totality of the circumstances' surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Id.

Wallace argues that under Elstad the delayed administration of Miranda warnings was a circumstance calculated to undermine his free will and that it rendered his subsequent confession involuntary. In Wallace's case, however, the state court's finding of voluntariness despite the delay was not contrary to, nor an unreasonable application of, federal law. After properly finding that the police did not ask questions designed to elicit an incriminating response prior to giving the warnings (and that Miranda therefore did not apply to Wallace's initial phase of

36

questioning), the state court properly applied federal law by assessing the voluntariness of his waiver under the totality of the circumstances.

Although the state court found that the pre-warning questioning of Wallace was not interrogation, it properly considered delay as a circumstance bearing on the voluntariness of Wallace's post-warning waiver. Voluntariness factors include "both the characteristics of the accused and the details of the interrogation." Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). The court found that the pre-warning period of questioning was not continuous because Wallace had regular breaks to access food, drink, and the restroom. There were no indications that Wallace was sleep-deprived or under the influence of any impairing substance during this time. Investigators Price and Corwin testified that Wallace read and initialed the Miranda form with comprehension and without hesitation, and that Wallace told them he had been read Miranda rights before. The state court found that the police did not ask specific questions regarding Wallace's relationship with the victims until after they gave the warnings. Wallace was allowed to sleep after his first detailed confession and before he accompanied police on the van ride, where he again waived his rights. The state court also found that Wallace did not view

his request to see his girlfriend and daughter as a condition for giving statements.

Given these factual findings, which Wallace did not rebut with clear and convincing evidence, we cannot say that the state court unreasonably found Wallace's confessions voluntary despite the delay. Although the police clearly hoped that the pre-warning rapport they established with Wallace would continue after the warnings, federal law countenances this strategy. The Elstad Court noted that the Fifth Amendment is not "concerned with moral and psychological pressures to confess emanating from sources other than official coercion." 470 U.S. at 304-05. The state court reasonably found that the delay did not amount to official coercion.

We also decline to hold that the state court unreasonably found that Investigator Rice's prayer did not render Wallace's confessions involuntary. The prayer was given after Wallace had been advised of his Miranda rights. The state court found that Wallace agreed to the prayer, expressed relief afterwards, and then gave detailed confessions to each murder. As with the delayed administration of warnings, the state court could reasonably find that the prayer was more in the nature of "moral pressure" than "official coercion." Elstad at 305.

38

III.

     For the foregoing reasons, we conclude that the state court's decisions on Wallace's pretrial publicity and confession claims were not contrary to, nor an unreasonable application of, clearly established federal law.  Accordingly, the district court's order dismissing Wallace's petition for writ of habeas corpus is

AFFIRMED.